UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------

UNITED STATES OF AMERICA

      v.                                      20 CR 510 (WHP)

MICHAEL WEIGAND,

      *Defendant.*

-----------------------------------------------------


## SENTENCE MEMORANDUM
## FOR THE DEFENDANT MICHAEL WEIGAND

Avrom Robin, Esq.
Law Offices of London & Robin
99 Park Ave. PH A/Suite 2600
New York, NY 10016
tel: 212-683-8000
fax:212-683-9422
avrom@mindspring.com
a.robin@londonrobin.com

*Attorney for Michael Weigand*

December 4, 2020

# Table of Contents

**Introduction** …………………………………………………………………… 3

**Procedural History** ……………………………………………………………. 3

**The Information and The Plea Agreement** …………………………………….. 4

**The Presentence Report** ………………………………………………………. 5

**The Appropriate Sentence in light of the Section 3553(a) factors** ……………….. 6

    1. The Nature and Circumstances of the Offense ……………………………. 6

    2. The History and Characteristics of the Defendant …………………………. 8

    3. Other Facts for Consideration ……………………………………………... 9

        A. COVID-19 has created harsh prison conditions …………………… 9

        B. Mr. Weigand's increased risk due to his obesity ……………………. 11

**Conclusion** …………………………………………………………………….. 12

INTRODUCTION

Michael Weigand, age 59, was born, raised and has lived in Ohio his entire life. Mr. Weigand is married and has two adult sons, also living and working in Ohio. He is a college graduate with a major in electrical engineering and a minor in computer science. This case is his first contact with the criminal justice system. Mr. Weigand has worked in the information technology and computer programming field for most of his working life, and is presently employed at a large technology firm near his home.

Mr. Weigand is scheduled for sentence on December 18, 2020. This sentence memorandum contains background and information in support of my request for a sentence of probation, a sentence at variance with the plea agreement and PSR guideline range of 6–12 months.

PROCEDURAL HISTORY OF THE CASE

In 2018 Michael Weigand was questioned at his home in Ohio by law enforcement agents.

In January of 2019 Mr. Weigand traveled to the SDNY from his home in Ohio voluntarily to meet again on two days with law enforcement agents at the U.S. Attorney's Office.

On September 21, 2020 Mr. Weigand pleaded guilty to a one count Information charging him with making false statements to federal law enforcement agents at the two meetings in January of 2019.

Mr. Weigand was released on bail conditions that same day and has continued to work at his job in Ohio. He has been compliant with his pretrial release conditions.

Also on September 21, 2020 a date of December 18, 2020 was set for sentence. Mr. Weigand will be ready to proceed on that date.

## THE INFORMATION AND THE PLEA AGREEMENT

Mr. Weigand waived Indictment and proceeded to plead guilty to a one Count information, which charged that on January 6 and 7, 2019 he knowingly made false statements to law enforcement agents regarding acts he committed from about 2011 to the end of 2013. These false statements concerned an account he opened on the Silk Road website; his use of the online pseudonym "Shabang"; his transfer of Bitcoin to the Silk Road website; his work exposing computer security vulnerabilities in the Silk Road website; his communications with "Dread Pirate Roberts"; services he performed for the Silk Road website; and the purpose of his trip to London in late 2013. These false statements were all in violation of 18 U.S.C. § 1001(a).

The plea agreement stipulates to the following guideline range:

A. Offense level:

1. The Guideline manual in effect as of November 1, 2018 apply in this case.
2. The Guideline applicable to the offense charged in Count One of the Information is U.S.S.G. § 2B1.1.
3. Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level is: 6
4. Because the loss amount is more than $40,000 but less than $95,000, the offense level is increased by: 6

5. A 2 level reduction is warranted if the defendant clearly demonstrates acceptance of responsibility through his allocution and subsequent conduct:                -2

   Applicable Guidelines offense level:                10

B. Criminal History Category:

   Based on information presently available to the parties, the defendant has no criminal history points and is therefore in Criminal History Category 1.

C. Sentencing Range:

   The stipulated Guideline range is 6-12 months imprisonment.

## THE PRESENTENCE REPORT

On November 13, 2020 counsel received the first release of the Presentence Investigation Report ("PSR") from Probation.

The PSR finds the same offense level calculation and applicable Guideline range of 6-12 months in Criminal History Category I as the plea agreement.

On November 20, 2020 undersigned counsel emailed a letter to the Probation Officer with some objections, corrections, and additional information.

This sentence memorandum will file before the final PSR is released to counsel and the Court.

Any unresolved objections to the final PSR will therefore be raised with the Court at sentence.

## THE APPRORIATE SENTENCE
## IN LIGHT OF THE SECTION 3553(a) FACTORS

The nature and circumstances of the offense, and the history and characteristics of the defendant, along with the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, along with the need for the sentence to provide adequate deterrence and protect the public from further crimes of the defendant, are among the most important considerations of 18 U.S.C. § 3553(a) as relevant to Mr. Weigand.

1. The Nature and Circumstances of the Offense

This is the most complex § 3553(a) factor. On the face of it, Mr. Weigand's crime, lying to federal agents in January of 2019, appears relatively straightforward. In two meetings with law enforcement, he was asked questions about past conduct, and he gave false answers.

The circumstances of those false statements, specifically, that they concerned conduct of Mr. Weigand in a time period beyond the statute of limitations, is where this gets complicated.

The background to this offense starts in 2005 when Mr. Weigand first met Roger Thomas Clark ("Clark") in an online forum. Mr. Weigand's father-in-law had been diagnosed with lymphoma, and a hospice caregiver recommended marijuana as a possible aid in pain relief. Unavailable legally in Ohio, Mr. Weigand looked for information about marijuana online and connected there with Clark in a marijuana forum. Although Mr. Weigand never found a source for marijuana for his father-in-law, who died that same year, he remained in sporadic contact with Clark.

6

In 2006 Clark paid Mr. Weigand to do some programming work on an online shopping cart called OS commerce. Thus began a relationship in which Clark utilized and paid Mr. Weigand for his programming expertise. Mr. Weigand travelled to London, where Clark lived, in 2006 to help Clark program computers that controlled the temperature and humidity in Clark's marijuana seed growing warehouse outside of London. Clark paid Mr. Weigand for his trip expenses and his time.

Clark later became interested in Bitcoin, a digital or virtual currency created in 2009, presumably as a way to get paid for his cannabis seed online sales. Later, after Clark joined Ross William Ulbricht in the Silk Road, the notorious website that hosted a black market bazaar on the internet from 2011 to 2013, Clark's interest in Bitcoin accelerated. Clark borrowed Bitcoin from Mr. Weigand in 2011 and deposited them into a Silk Road account. Clark and Ulbricht worked together closely on The Silk Road. Clark enlisted Mr. Weigand's programming expertise in internet and software development and used that expertise in both Clark's online marijuana seed business and in the Silk Road. Mr. Weigand also registered multiple domain names and set up a website at Clark's request.

Mr. Weigand travelled to London again at Clark's request in 2013 and took Yubikeys, a hardware authentication device from Clark's apartment there.[1] Ulbricht's arrest in the United States in October 2013 may have been behind Clark's desire to get the Yubikeys out of his London apartment. Mr. Weigand ultimately sold the Bitcoin and Yubikeys he had gotten from

---

[1] Yubikeys, a computer accessory device the size of a typical thumb drive, are legal and there are millions in use around the world by businesses and individuals for computer security. https://www.yubico.com/

7

the Silk Road and Clark either as a return of his loan or payment for his programming, and this is the source of the loss amount set forth in the plea agreement.

So, Mr. Weigand did software and programming work on and off for Clark and the Silk Road. But Mr. Weigand was never a partner in the Silk Road. He was a computer expert who was paid for his expertise, but he was never a principal or part of the Silk Road's management, ownership, or decision making, or even a full time employee of the Silk Road. Those management roles belonged to Ulbricht and Clark but never to Mr. Weigand. Mr. Weigand had a very limited role in all this.

2.  The History and Characteristics of the Defendant

Putting aside for a moment this long and unfortunate episode in his life, Mr. Weigand has otherwise led a remarkably conventional, hard-working, family oriented and law-abiding life in his 59 years.

Mr. Weigand has always lived in Ohio. He was born, raised and educated there. He attended high school in his then hometown of Canton, Ohio. Mr. Weigand's interest in computers started in high school in 1979 when he participated in a computer program sponsored by Hewlett Packard. He went to college at the University of Akron, where he graduated in 1984 after a five-year program which included a major in electrical engineering and a minor in computer science.

In 1984 he worked on automated testing equipment at his first job out of college. In 1986 he moved to another job where he worked on automobile transmission testing equipment. After that, he started his own business in the same field, and did that until 2018. At that time he started

working at Bird Electronic Manufacturing, Inc. in Solon, Ohio, where he is presently still employed.

Mr. Weigand and his wife of many years have raised two sons, now 27 and 31 years old. Both sons are independent and out of the parental house, living and working on their own in Ohio. The family remains close. All but one of Mr. Weigand's four siblings also live in Ohio.

3. Other Facts for Consideration

My request is for a sentence of probation instead of a term of imprisonment. Mr. Weigand has a low guideline range, a lack of criminal history, and at the age of 59 is statistically unlikely to reoffend. Given the threat to his health posed by imprisonment in the present COVID-19 crisis which society at large and prisons in particular are facing, I submit that the risk of Mr. Weigand's contracting COVID-19 in prison outweighs the 18 U.S.C. § 3553(a) need to incarcerate him in this case. The sentencing factors of § 3553(a) can be satisfied with a term of probation for Mr. Weigand.

A. COVID–19 Has Created Harsh Prison Conditions

The abnormal and harsh conditions Mr. Weigand would endure in prison provide a compelling reason for a sentence of probation.

As we all learned in the spring of 2020, during the first wave of COVID-19 infection in the United States, infection rates in prisons lag behind but follow rates in the general U.S. population. Now, during the second wave of infection, we see that same phenomenon playing out.

BOP facilities are routinely locked down during this crisis, which means inmates are confined to their cells or dormitories for almost 24 hours a day. Education and other programs are canceled; recreation is canceled or severely limited; telephone and computer use for emails to family and friends are limited; social visits are canceled; even meals are brought to the cells or dorms, instead of being served in dining halls.

On October 5, 2020 Dr. Anthony Fauci stated in an interview that the U.S. is "not in a good place" entering the fall and winter months, a reference to the over 40,000 new cases reported each day at that time. The situation, both in and out of prisons, has gotten progressively worse since then.

Now, two months after Dr. Fauci's dire warning in October, *The New York Times* reported on November 29, 2020 that daily virus deaths were approaching the record set on April 15, 2020, and that over 151,000 new cases were reported on November 29, 2020. By just a few days later, on December 3, 2020 the daily U.S. virus death total exceeded the April record.

Dr. Robert R. Redfield, the director of the Centers for Disease Control and Prevention ("CDC"), stated a few days ago about the next three months, "I actually believe they are going to be the most difficult time in the public health history of this nation." *New York Times*, December 3, 2020.

Infection rates in the BOP both among staff and inmates have continued to rise as well. https://www.bop.gov/coronavirus/

B.  <u>Mr. Weigand's Increased Risk Due To His Obesity</u>

Mr. Weigand's obesity puts him at high risk for serious Covid-19 complications if he becomes infected in prison and is another strong reason to sentence him to probation instead of incarceration.

Mr. Weigand is 5'7" tall and weighs 250 pounds. PSR ¶ 77.  With a body mass index ("BMI") number of 39.2, Mr. Weigand is classified as "obese" – the category more serious than just "overweight" - on the National Institutes of Health ("NIH") body mass index charts. The obese category starts with a BMI of 30. https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm

The CDC website says that "people who are obese are at higher risk for chronic conditions such as high blood pressure, diabetes, and high cholesterol." The website also says that "obesity increases the risk of severe illness from Covid-19. Having obesity may triple the risk of hospitalization due to a COVID-19 infection. Obesity is linked to impaired immune function. Obesity decreases lung capacity and reserve and can make ventilation more difficult. As BMI increases, the risk of death from COVID-19 increases." And finally, "Studies have demonstrated that obesity may be linked to lower vaccine responses for numerous diseases." https://www.cdc.gov/obesity/data/obesity-and-covid-19.html

## CONCLUSION

I submit that the Court, after considering all the relevant § 3553(a) factors, can find that a sentence of probation without incarceration is appropriate for Mr. Weigand.

Respectfully submitted,

AVROM ROBIN

cc: A.U.S.A. Michael Neff (via ECF)