kci2WeiS kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4              v.                            20 Cr. 510 (WHP)

5   MICAEL WEIGAND,

6                Defendant.

7   ------------------------------x          Videoconference

8                                            Sentencing

9
                                             December 18, 2020
10                                           2:00 p.m.

11
    Before:
12
                    HON. WILLIAM H. PAULEY III,
13
                                             District Judge
14

15


16                      APPEARANCES

17
    AUDREY STRAUSS
18       Acting United States Attorney for
         the Southern District of New York
19  BY:  MICHAEL D. NEFF
         Assistant United States Attorney
20


21
    AVROM J. ROBIN
22       Attorney for Defendant

23

24

25


                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

kci2WeiS kjc

1            THE COURT:  In the case of United States of America v.

2    Michael R. Weigand, would counsel for the government give his

3    appearance.

4            MR. NEFF:  Good afternoon, your Honor.  Michael Neff

5    for the government, and also on the line are IRS Supervisory

6    Special Agent Gary Alford and F.B.I. Special Agent Sam

7    Shahrani.

8            THE COURT:  All right.  Good afternoon to you,

9    Mr. Neff.

10           Would counsel for the defendant give his appearance.

11           MR. ROBIN:  Good afternoon, your Honor.  This is Avrom

12   Robin for the defendant, Michael Weigand, who is also present

13   with us via Skype.  He is wearing a red shirt.  You should be

14   able to see him.

15           THE COURT:  I am.  Thank you.  Good afternoon to you,

16   Mr. Robin.

17           Mr. Weigand, I note your presence via Skype.  Are you

18   able to see and hear me, sir?

19           THE DEFENDANT:  Yes, I am.

20           THE COURT:  Very well.  And just for the record, where

21   are you currently located?

22           THE DEFENDANT:  At home.

23           THE COURT:  All right.  And where is that, sir?

24           THE DEFENDANT:  That would be Kirtland, Ohio.

25           THE COURT:  All right.

kci2WeiS kjc

1          Now, we are here today for sentencing.  As we all

2     know, we are in the middle of the COVID pandemic, and I'm

3     conducting this proceeding remotely pursuant to the authority

4     provided by the CARES Act, Section 15002, and the standing

5     orders that were issued by the chief judge of this district.

6     I'm proceeding by videoconference, namely, via Skype, as are

7     counsel and the defendant.

8          Mr. Robin, have you discussed with your client

9     proceeding today via videoconference as opposed to appearing in

10    court in person?

11          MR. ROBIN:  Yes, Judge, I have.

12          THE COURT:  All right.

13          Mr. Weigand, do you waive your right, sir, to be

14    physically present in court and to proceed today by

15    videoconference?

16          THE DEFENDANT:  I do.

17          THE COURT:  And if at any point during this

18    proceeding, you are unable to hear me or see me or the other

19    participants in this proceeding, will you let me know right

20    away so that we can address that?

21          THE DEFENDANT:  I will.

22          THE COURT:  And also if at any point you would like to

23    speak privately with your attorney, will you let me know that

24    right away, and I will -- so that we can coordinate that with

25    you and your attorney?

kci2WeiS kjc

1              THE DEFENDANT:  I will.

2              THE COURT:  Very well.

3              Based upon this colloquy, I find a knowing and

4    voluntary waiver of the right to be physically present for this

5    proceeding.  I also find that today's proceeding cannot be

6    further delayed without serious harm to the interests of

7    justice.  It is important that this matter proceed through

8    sentencing to bring finality to the matter both for the Court

9    and the parties.  Resolution of this matter remotely advances

10   these issues and promotes justice without undue delay to wait

11   until some unknown time in the future when we can proceed in

12   person.  And so I find that this proceeding cannot be further

13   delayed without serious harm to the interests of justice.

14             As I have said, this matter is on for sentencing.  Are

15   the parties ready to proceed?

16             MR. NEFF:  Yes, your Honor.

17             MR. ROBIN:  Yes, for the defense, we are ready.

18             THE COURT:  All right.

19             Mr. Robin, have you reviewed with your client the

20   presentence investigation report?

21             MR. ROBIN:  Yes, Judge, I have.

22             THE COURT:  All right.  I note that the parties had

23   previously submitted various amendments to the report, and I

24   ask you, Mr. Robin, whether the defendant has any further

25   modifications or amendments to the presentence report?

kci2WeiS kjc

1          MR. ROBIN:  I do just have one small one, Judge, but

2     it's more by way of a clarification.  It goes to paragraph 89,

3     about the defendant's negative monthly cash flow.

4          THE COURT:  Go ahead.

5          MR. ROBIN:  Just going back one page, to paragraph 20,

6     the reason for the negative monthly cash flow on this specific

7     month -- it is not a habit of Mr. Weigand and his wife to

8     overspend -- under "clothing" there is an entry for $704, and

9     that includes, by mistake, an amount that was spent for a new

10    set of tires for Mrs. Weigand's car, totaling about $600 or

11    over $600, so that explains the negative cash flow in this

12    given month.

13         THE COURT:  All right.  I appreciate that

14    clarification.  Is there any reason to make any change in the

15    report?

16         MR. ROBIN:  No, I don't think so, Judge.  I don't

17    think it is necessary.

18         THE COURT:  All right.  Thank you.

19         Mr. Neff, are there any matters in the presentence

20    report that the government believes warrant modification or

21    correction?

22         MR. NEFF:  Thank you, Judge.  There is, I believe --

23    there are two small joint requests from the parties, and

24    Mr. Robin will correct me if I am mistaken.  We submitted an

25    e-mail to your Honor's deputy last night just so that your

kci2WeiS kjc

1    Honor would have the precise wording that we are proposing and

2    the alphanumeric string associated with one of the identifying

3    numbers.  Would it be useful for me to read those two things

4    into the record, those two requests?

5              THE COURT:  Yes, I think it would, Mr. Neff.

6              MR. NEFF:  Certainly.

7              As to paragraph 41 of the PSR, there is a request to

8    strike the phrase "and there is no evidence that links Weigand

9    to the murder-for-hire scheme."  And then in paragraph 42, the

10   request is to add a new sentence at the end of that paragraph,

11   following the block quote, which would state, "There is no

12   evidence or claim that links Weigand to the murder-for-hire

13   scheme of Ulbricht and Clark."  That is the first request.

14             The second request, which also is a joint request, is

15   that Mr. Weigand's F.B.I. and Marshal numbers be added to page

16   2 of the PSR, which I believe presently states "unknown," but

17   recently those numbers have become known.  The Marshal number

18   is 20570-509, and the F.B.I. number is R748EL9TN.

19             THE COURT:  All right.  I will endeavor to have those

20   physical corrections made to the presentence report.

21             MR. NEFF:  Thank you, Judge.

22             THE COURT:  All right.

23             I have received the parties' various submissions.

24   Mr. Robin, do you wish to be heard?

25             MR. ROBIN:  I do, Judge.  Thank you.

kci2WeiS kjc

1        I would like to speak on three topics.  One is

2   Mr. Weigand's character; the second is the crime we are here

3   for today; and the third is the appropriate sentence.  I will

4   be brief on all of the subjects because I have covered them in

5   depth in my submission.

6        To Mr. Weigand's character, Judge, this conduct is out

7   of character, in what has -- in his life otherwise, which has

8   been conventional, hard-working, tax-paying.  The letters and

9   the PSR speak to his being a good family man, a good husband, a

10   good father, a good son-in-law.

11        He spent the whole of his 59 years in the State of

12   Ohio.  There is not a hint of any bad conduct anywhere in his

13   background other than this offense, and the strong letters from

14   his family support that.  The family is clearly -- and this

15   comes out in the letters -- in shock and disbelief that he

16   would do anything criminal, because it is out of character for

17   him, as they know him and as they have lived with him.

18        Even Mr. Weigand's present employer, with whom he has

19   discussed this case and given a copy of his plea agreement,

20   said he is willing to keep Mr. Weigand on as a software

21   engineer, providing he doesn't have to go to jail and can't

22   work, and that, again, is because of his character and the good

23   quality of his work that he does.

24        And even Roger Thomas Clark, who we will get to in a

25   minute, says at some point that Mr. Weigand wants to be a

kci2WeiS kjc

1    family man and doesn't want to go all in to this crime.

2                And with that, I will turn to my second piece, the

3    crime, the Silk Road.

4                The crime of sentence is lying to federal agents, but

5    the background of the subject lies in Mr. Weigand's

6    relationship to Roger Thomas Clark, whose case I know is

7    pending before your Honor.

8                Mr. Weigand met Roger Thomas Clark online in 2005, as

9    I explained in my sentencing memorandum, and Mr. Weigand bonded

10   with Clark back then when Mr. Weigand was looking for a source

11   for marijuana for medical use to treat his father-in-law's

12   lymphoma, and their online relationship, Clark and Weigand,

13   continued.  And this is the source of Mr. Weigand's problems

14   here.

15               His problem, as I see it, stems from the fact, Judge,

16   that he never learned to say no to Clark's requests.  And at

17   some point, certainly by 2011, when Clark had become Ross

18   Ulbricht's right-hand man and senior advisor in the Silk Road,

19   paragraph 10 in the PSR, Mr. Weigand should have been asking

20   himself a lot more questions about what Clark was doing with

21   Mr. Weigand's work product and insights and technological

22   assistance and guidance.  Mr. Weigand turned a blind eye here.

23   And we know that willful blindness is not a defense, and

24   Mr. Weigand's guilty plea acknowledges that reality, because

25   his lies to law enforcement were in an attempt to cover up what

kci2WeiS kjc

1    he now knows was illegal conduct, the Silk Road.

2            Still, he is not responsible -- he, my client -- for

3    the whole of the Silk Road.  He is a guy who did some tech work

4    for the Silk Road.  He didn't do all of the tech work.  A lot

5    of other people were involved.  He did not, for example, as is

6    referred to in paragraph 14 of the PSR, set up the so-called

7    tumbler that disguised the processing of Bitcoin transactions.

8            The government does detail in their letter what he did

9    do.  I'm not going to quibble with that now.  But I think he

10   had a lesser role, judging from the amounts of money we are

11   talking about here and from the fact that other people who have

12   been sentenced by other judges were significantly more

13   involved.  Silk Road would have existed without Mr. Weigand.

14   He is good at what he does, my client, but his skills are not

15   unique to him.

16           I would like to turn now for a minute to the money

17   amounts that have come up in the record here so far.  Paragraph

18   17 -- and when I speak of paragraphs, I of course refer to the

19   PSR -- Ulbricht's assets, $104 million; paragraph 18,

20   Ulbricht's seized Bitcoins, $18 million; paragraph 21 and

21   paragraph 47, Mr. Weigand's loss amount here, which is part of

22   his guideline calculation, a total of $75,000 -- $10,000 in

23   YubiKeys, a security device that he sold a number of on eBay,

24   and $65,000 in Bitcoins.

25           So I think when you put that up against even the

kci2WeiS kjc

lesser amount of $18 million Ulbricht-seized Bitcoins, kind of

gives you some idea of Mr. Weigand's relative position in this

case.

Yes, paragraph 25, he supplied advice, technological

analysis, ideas and --

(Indiscernible crosstalk)

THE COURT:  Excuse me.  Whoever is interrupting this

proceeding, please put your phone on mute.

Please proceed, Mr. Robin.

MR. ROBIN:  Thank you, Judge.

And paragraph 26, again, Clark says he is not in the

top circle, Mr. Weigand, because he doesn't want to be.  He

wants to raise a family without the high level of stress.  He

is a resource, and a great one, but doesn't want to go all in.

I'm going to move on to sentence here, Judge, the

third and final part of my presentation.  I want to talk for a

minute about the guidelines and the loss amount.  I know we

have lots of conversations about how loss amount and, in other

cases, drug amounts drive the guidelines.  I think in a way

this case is a good example, because if Mr. Weigand were at

just one level less, in other words, if he were at 15 to

$40,000 loss amount, instead of the $40 to $95,000 he is in, we

would be adding four levels, not six levels, and his

guideline -- his total adjusted guideline range would be zero

to six months instead of six to twelve months, and I would be

kci2WeiS kjc

1    asking for a sentence at the bottom of range, not a variance,

2    like I am now.  And that is not a big difference, I submit, 25,

3    $30,000.

4            Moving on, as your Honor is obviously acutely aware,

5    this is not business as usual today.  COVID is a once-in-100-

6    years event.  Mr. Weigand is not young.  He is not of a normal

7    body mass.  He is at higher risk if he is imprisoned.

8            The felony conviction, Judge, here, is the real

9    punishment.  If the present employer does let him go, and we

10   hope he doesn't, but if that happens, Mr. Weigand is going to

11   have a really tough time getting rehired at the age of 59 with

12   a felony conviction in his field.

13           So I submit there is no need to incarcerate him.  The

14   reality of the felony conviction, in addition to his age,

15   obesity, the COVID risk, his lack of prior offenses, all

16   support a nonjail sentence in this case.

17           Thank you, Judge.

18           THE COURT:  Thank you, Mr. Robin.

19           Mr. Neff, does the government wish to be heard?

20           MR. NEFF:  Yes, your Honor.  Thank you.

21           I would like to briefly speak to the 3553(a) factors

22   and also briefly respond to some of the defense's points from

23   today.

24           As to the nature of the offense, the defendant made a

25   calculated, deliberate decision to lie about his and Clark's

kci2WeiS kjc

1    involvement in the Silk Road.  The defendant tried to inject

2    false information into the justice system.  He tried to

3    obstruct Clark's case.  He put his loyalty to Clark first.  He

4    put loyalty before truth.  He wanted his very close confidante

5    to get off scot-free.  These were the defendant's decisions,

6    and it was *déjà vu* all over again.

7            In 2013, the defendant tried to obstruct the

8    investigation of Clark.  In 2019, the defendant tried to

9    obstruct the prosecution of Clark.  2013 involved physical

10   evidence in London.  2019 involved false statements in New

11   York.

12           The defendant's false statements were the culmination

13   of a multiyear, multicontinent, multifaceted campaign of

14   obstruction.  It's worth noting that if other people did what

15   the defendant has done, it would have significant consequences

16   for the justice system, for defendants, for victims, for the

17   public's trust in the system, to name just a few of the

18   consequences.  So from the perspective of general deterrence,

19   we ask the Court to send a very clear message that deliberately

20   injecting false information into the justice system comes with

21   serious consequences.

22           As to specific deterrence, there were so many major

23   moments across this eight-year campaign when the defendant

24   could have stopped and should have stopped.  Seven such moments

25   promptly come to mind: Ulbricht's arrest, Ulbricht's bail

kci2WeiS kjc

arguments, Ulbricht's conviction, Ulbricht's life sentence,
Clark's being publicly identified, Clark's arrest, Clark's
extradition.  That's seven major moments from 2013 to mid 2018.
Any one of these moments should have conveyed to the defendant
enough is enough.  Stop committing crimes.  And in particular
one certainly would have thought that a life sentence for
someone you directly helped, Ross Ulbricht, would have served
as a very clear wake-up call, that this is extremely serious
business, and I better stop playing with fire.  But after all
of these moments, the defendant obstructed again through his
false statements in 2019, again trying to help Clark and
himself.

          I want to briefly address a few of the points raised
by the defense today.

          I believe the defense used the phrase at one point
"turned a blind eye."  He didn't turn a blind eye.  He knew
what he was doing.  We quote the messages where the defendant
gave advice, technological advice, directly to Ross Ulbricht.
Ross Ulbricht's moniker, his online nickname at that time, was
Silk Road.  This was not willful blindness.  This is willful
participation.  This was willful hacking followed by willful
aiding and abetting narcotics distribution, followed by willful
money laundering, followed by willful obstruction, followed by
willful lies.  It was not just about Clark, as mentioned.
There was advice to Ulbricht, too.  This was very willful and

kci2WeiS kjc

1    very harmful and a clear message -- we submit a clear message

2    should be sent that this is not acceptable and will not be

3    tolerated.

4            For these reasons, as well as those in our submission,

5    we respectfully request a sentence at the top of the guidelines

6    range.

7            THE COURT:  All right.  Thank you, Mr. Neff.

8            Mr. Robin, does your client wish to address the Court

9    before sentence is imposed?

10           MR. ROBIN:  My client and I have discussed that,

11   Judge, and his preference would be to allow me to speak for him

12   and not to make a statement today.

13           THE COURT:  Very well.

14           So the defendant, Michael Weigand, comes before this

15   Court, having pled guilty to making false statements to

16   government officials, a serious crime against the United

17   States, to be sure.  In this particular case, those false

18   statements went beyond their mere falsity to essentially try to

19   sidetrack the government's efforts to bring to an end a vast

20   global criminal enterprise known as the Silk Road.

21           This Court has reviewed the presentence investigation

22   report.  I adopt the findings of fact in the report as amended

23   here on the record as my own, and I will cause the report to be

24   docketed and filed under seal as part of the record in this

25   case.

kci2WeiS kjc

1        Turning to the guidelines calculation, the base

2    offense level for making false statements is six and the

3    specific offense characteristic here, based upon his false

4    statements relating to money laundering activities, as

5    Mr. Robin has noted, propels that base offense level of six by

6    six more units.

7        Now, the defendant pled guilty and accepted

8    responsibility for his criminal act and, accordingly, I grant

9    him a two-level reduction, and so his total offense level is

10   10.

11       As the parties have noted, this is his first criminal

12   conviction and so, with a criminal history category of I and a

13   total offense level of 10, his guideline range is from six to

14   twelve months of imprisonment.

15       Now, of course, as in all cases before the Court for

16   sentencing, the question is what to do with this individual who

17   is before me.  He is in some ways a very puzzling figure to me.

18   He grew up in a firmly middle class background, with a nuclear

19   family and siblings, you know, all of whom have gone on in

20   their lives, many of them professionals.  He, too, went to

21   college, got an engineering degree, and became essentially a

22   software engineer, working for a portion of his life as an

23   independent contractor and then working for various firms.

24       He is obviously very bright.  He has a very special

25   technical expertise that he brought to bear in essentially

kci2WeiS kjc

1   helping to enable a criminal enterprise that he certainly

2   should have seen the red flags that were all around him with

3   respect to Mr. Clark and Mr. Ulbricht.

4          And he continued on this path for a number of years,

5   even after the government had uncovered Silk Road and arrested

6   its founder and was prosecuting the founder's right-hand man,

7   Mr. Clark, through extradition proceedings.  But he went on

8   with the disinformation.

9          And so it's a serious offense that requires both

10  general deterrence, for the obvious reasons, and specific

11  deterrence.  And while, you know, he didn't found Silk Road, he

12  certainly helped perpetuate its existence by providing

13  technical expertise to Clark and Ulbricht, and even taking acts

14  like traveling, traveling to London on very short notice to

15  remove evidence from Clark's apartment, and going in a

16  disguised way, going through Toronto, as if he were not

17  traveling overseas.  It was very much cloak and dagger.  And

18  were it not for the incredible work of the IRS agent who first

19  started on this case and his keen analytical insights, who

20  knows how long this may have continued and how much harm it

21  could have caused to people not only in the United States but

22  around the world?  So I do think that there is, as I said, a

23  compelling need for deterrence.

24         I am also somewhat skeptical of the defendant's

25  argument that there is little possibility of recidivism here,

kci2WeiS kjc

1   given his age.  These were -- this was a crime that essentially

2   in part is committed almost anonymously and, therefore, it can

3   be particularly pernicious.

4         So I do think that some term of imprisonment is

5   entirely appropriate here.  I think that the defendant received

6   from the government a very tempered plea offer, which the

7   defendant accepted, and that also helps to bring finality in

8   the case.  I am cognizant of the defendant's medical issues,

9   and I do not intend for him to serve a term of imprisonment

10  while the -- while the pandemic is ongoing and there are

11  outbreaks in correctional facilities around the country.  But

12  this is a crime that contributed to a much larger crime for

13  which he was not charged, a crime that, as the parties have

14  already observed, led to a term of life imprisonment for the

15  leader of Silk Road, which was affirm by the Second Circuit,

16  and because of the anonymity that these sort of dark web

17  enterprises can enjoy, it makes it incredibly difficult for law

18  enforcement to be able to root them out.

19        And so it is against this backdrop, looking at who

20  Mr. Weigand is, you know, a very intelligent, analytical,

21  thoughtful person, raised -- not only did he grow up in a good

22  family in Ohio, he and his wife have raised a good family in

23  Ohio, and he has, you know, two sons that he can be very proud

24  of.  And so it gives me no pleasure to have to impose a term of

25  imprisonment on him, but I will not shirk from that duty

kci2WeiS kjc

1   because I think that his conduct over a period of eight years,

2   culminating in his false statements and his dissemination of

3   disinformation, warrant a term of imprisonment.

4           And so, Mr. Weigand, it is against that backdrop, sir,

5   and I have tried to explain to you why I believe a term of

6   imprisonment is appropriate here, it is my judgment, sir, that

7   you be sentenced to a term of eight months of imprisonment, to

8   be followed by three years of supervised release, subject to

9   all of the standard conditions of supervised release, and the

10   following special conditions:

11           First, that you will submit your person, property,

12   residence, vehicle, papers, computers, other electronic

13   communication, and data storage devices, cloud storage, or

14   media and effects to a search by any United States probation

15   officer and, if needed, with the assistance of any law

16   enforcement.  The search is to be conducted when there is a

17   reasonable suspicion concerning violation of the conditions

18   of supervision or unlawful conduct by the person being

19   supervised.  Your failure to submit to such a search may be

20   grounds for revocation of release.  You are to warn any other

21   occupant of the premises where you reside that those premises

22   may be subject to search pursuant to this condition and any

23   such search will be conducted at a reasonable time and in a

24   reasonable manner.

25           Further, I'm going to require you to provide your

kci2WeiS kjc

1   probation officer to access to any requested financial

2   information, and I am going to require you, as well, to not

3   incur any new credit card charges or open additional lines of

4   credit unless you are in compliance with a brief installment

5   payment schedule that I am going to impose upon you.  I am

6   going to impose a -- I cannot agree with probation to impose

7   the fine that they propose, but it is my judgment that you

8   should bear some financial consequence for this, because it was

9   really driven by an interest in financial gain.  And so it is

10  my judgment that you should pay a fine of $4,000.  It can be

11  paid in installments over time, and you are going to be

12  continuing, I presume, to work for a while, awaiting surrender,

13  and so I think that it is likely that this fine should be paid

14  between now and the time that you do surrender to the United

15  States Marshal Service.

16          I am also going to impose the mandatory $100 special

17  assessment which will be due and payable immediately.

18          Now, this constitutes the sentence of this Court,

19  Mr. Weigand.  I advise you that to the extent you have not

20  previously waived your right to appeal, you have the right to

21  appeal.  I advise you further that if you cannot afford

22  counsel, counsel will be provided to you free of cost.

23  Mr. Robin has done an outstanding job for you in connection

24  with this matter, in his negotiation of the plea and in his

25  submissions on your behalf with respect to sentencing, and I am

kci2WeiS kjc

1    confident that he will advise you further with respect to your

2    appellate rights.

3           Now, I can't see into the future, but for now, I am

4    going to propose that your surrender date be in April of 2021.

5    And if, Mr. Robin, the situation within the Bureau of Prisons

6    or generally with respect to the pandemic has not been resolved

7    by that time, you may feel free to make a further application

8    to me to extend his surrender date.

9           Now, if you will bear with me for one moment, I will

10   set his surrender date to a facility to be designated by the

11   Bureau of Prisons on April 29, 2021.

12          Are there any further applications from the

13   government?

14          MR. NEFF:  No, your Honor.  Thank you.

15          THE COURT:  Mr. Robin, are there any further

16   applications from the defendant?

17          MR. ROBIN:  Yes, Judge.  I would ask you to consider a

18   recommendation that he be incarcerated as close to home as

19   possible to facilitate family visits.

20          THE COURT:  I will include that recommendation on the

21   face of the judgment, Mr. Robin.

22          MR. ROBIN:  Thank you.

23          THE COURT:  All right.  Now, what district, what

24   judicial district does he live in in Ohio?

25          MR. ROBIN:  Northern judicial district.

kci2WeiS kjc

1            THE COURT:  All right.  I will include that in the

2    recommendation.

3            All right.  This proceeding is concluded.  I wish all

4    of you a safe holiday season.

5            Mr. Weigand, I trust that you will learn from all of

6    this and that I will not see you again in connection with any

7    violation of supervised release, so I wish you the best of

8    luck.

9            Have a good afternoon.

10           THE DEFENDANT:  Thank you, Judge.

11           MR. ROBIN:  Thank you.

12                              oOo

13

14

15

16

17

18

19

20

21

22

23

24

25